IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MELISSA JACKSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNITED AIRLINES, INC. | : | NO. 13-6227 |

**MEMORANDUM & ORDER**

Ditter, J.                                                                                                              July 15, 2014

Plaintiff, Melissa Jackson, brings this action against her former employer, United Airlines, Inc., alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). Before me are United's motions to dismiss based on Federal Rule of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7). For the reasons set forth below, United's motions are granted in part and denied in part.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

Jackson, who is over the age of 40, was employed by defendant United Airlines as a flight attendant from 1992 to 2011. At the time of her termination, on March 11, 2011, Jackson was a "Senior Flight Attendant" or "Purser." *Am. Compl.* ¶ 12. Jackson alleges that she was qualified for her position and had a satisfactory performance history. *See id.* ¶ 14. Jackson was based out of the Philadelphia International Airport from 1992 until 2006 when United closed its base there and transferred Jackson, and other flight attendants, to the three-airport Washington D.C. hub, where she primarily flew out of Baltimore-Washington International Airport.

Two policies that applied to all flight attendants during the times relevant to Jackson's complaint are pertinent to Jackson's allegations that United violated the ADEA and PHRA – United's "Sick Leave" policy and "Attendance Point Values" policy. The Sick Leave policy is

set forth in Section 19 of the "2005-2010 Agreement between United Airlines, Inc. and the Flight Attendants," which was the collective bargaining agreement in place at the time, (hereinafter referred to as "the CBA").  *See Def.'s Mot. Dismiss*, Exh. A to Cavanagh Dec.  Flight attendants were represented by their union, the Association of Flight Attendants-CWA, in the negotiation and execution of the CBA.  Pursuant to the Sick Leave policy, flight attendants were "credited for sick leave purposes with <u>four (4)</u> hours of sick leave credit for each month during their employment and shall be allowed to accrue up to a maximum of nine hundred-fifty (950) hours."[1]  *Id.*  These hours could accumulate over time in what was referred to as a "sick bank."  *Am. Compl.* ¶ 16.

Second, the Attendance Point Values policy is set forth in the Letter of Agreement ("LOA") entered into by the union and United in 2008.  *See Def.'s Mot. Dismiss*, Exh. B to Cavanagh Dec.  The LOA was intended to supplement and modify the earlier signed CBA.  Under Section II of the LOA, a point system applied to "attendance occurrences" in order to manage unscheduled absences.  *Id.*  As explained by United, this system covered "[u]nscheduled absences for any reason that are not Family and Medical Leave-related, personal emergencies, or absences excused by other policies."  *Cavanagh Dec.* ¶ 7.  These absences were assigned a point value, for example, one point for a "late check-in," two points for "illness/injury" over six days, and three points for a "DNF," which stands for "Did Not Fly."

According to Defendant, this Attendance Point Values policy is administered separately from the Sick Leave policy, so that sick bank hours "are unrelated and are not considered in this [Attendance Point Values] process."  *Def.'s Br.* at 4.  Thus, as a consequence of the CBA and

---

[1] Jackson alleges that flight attendants accrued 2.5 hours of sick leave per month.  Jackson does not cite to a source for this number of hours and does not explain the difference between her cited amount and the 4 hours listed in the CBA.  *See Am. Compl.* ¶ 16.  Nevertheless, the difference does not ultimately matter to the disposition of this case.

2

LOA, flight attendants who had sufficient hours in their sick banks would be paid for unexcused absences even though those absences were assessed penalty points.

Additionally, the LOA explains the process of point accumulation, notice to the flight attendant, and the progressive discipline applicable to Attendance Track discipline.[2]  *See* LOA, Sections II and III.  According to the LOA, a flight attendant is "assessed" a Letter of Warning ("LOW") at incremental levels, from LOW Level 1 to LOW Level 4, based on the number of points accumulated during a particular period of time.  *Id.*  For example, a LOW Level 1 is assessed when the individual has six or more points in a rolling 12-month period, and a LOW 4 is assessed when the individual accumulates 24 or more points.  *Id.*  Points can be cleared from the record after certain periods of time and as long as the flight attendant does not progress to another LOW level.  Flight attendants may seek review of a disciplinary letter by the Manager Onboard Service.  *See* CBA, Section 26 (outlining grievance procedures).  According to the LOA, however, even if an LOW or other notice is not sent or received, points will accumulate for occurrences, and it is the responsibility of the flight attendant to know the status of his or her point accumulation.  *See* LOA, Section II.H, II.I.

Eventually, if the flight attendant accumulates 30 or more points, he or she will be issued an "Attendance Letter of Charge" and be subject to termination.  *Id.*, Section III.A.1.  The CBA outlines the grievance procedures that are applicable when a flight attendant is subject to suspension or termination.  *See* CBA, Section 26 (discussing, *inter alia*, the flight attendant's right to a hearing on the matter, a written decision after the hearing, and a means to appeal the decision if dissatisfied).

---

[2] Under the LOA, there are two separate tracks for which progressive discipline applies, the Attendance Track and the Performance Track.  The Attendance Track is the only track discussed in the parties' filings.

Jackson has two types of age discrimination claims. First, a disparate impact claim that United's policies had a disproportionate impact on all flight attendants over age 40. Second, disparate treatment claims that United treated Plaintiff unfairly and acted in a discriminatory manner toward her. Count 1 of Plaintiff's amended complaint sets forth a claim for disparate treatment, or intentional age discrimination, in violation of the ADEA, while Count 2 alleges a disparate impact age discrimination claim in violation of the ADEA. Finally, Count 3 sets forth a claim of age discrimination in violation of the PHRA.

## II.  STANDARD OF REVIEW

United asserts three alternative grounds for dismissal of all or part of Jackson's claims. First, pursuant to Federal Rule of Civil Procedure 12(b)(1), United claims that this court lacks subject matter jurisdiction over all of Jackson's claims. Under Rule 12(b)(1), the burden of persuasion in proving subject matter jurisdiction is on the plaintiff, evidence outside the pleadings may be considered, and I need not assume the plaintiff's allegations in her complaint are true. *See Int'l Ass'n of Machinists and Aerospace Workers Dist. Local Lodge 1776 v. Jackson*, Civ. No. 09-150, 2010 WL 597247, at *2 (E.D. Pa. Feb. 19, 2010).

Alternatively, United argues that Jackson's disparate impact claim, as set forth in Count 2, and her PHRA claim for disparate treatment in Count 3 should be dismissed for failure to state a claim. Under Federal Rule of Civil Procedure 12(b)(6), a cause of action shall be dismissed for failure to state a claim upon which relief can be granted only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. I must accept as true the facts and allegations contained in the complaint and all reasonable inferences drawn therefrom and view the facts in the light most favorable to the non-moving party.

Finally, United argues on the basis of Rule 12(b)(7) that Jackson failed to join a necessary party, the Association of Flight Attendants, CWA. United contends that the union is a necessary party under Rule 19 and it ought to be joined if feasible. *See* Fed. R. Civ. P. 19(a). In the alternative, if joinder of the union is not feasible, United requests dismissal of the action. *See Id.* 19(b).

### III. DISCUSSION

#### A. Subject Matter Jurisdiction – Railway Labor Act Preclusion/Preemption[3]

The Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*, was enacted to promote stability in the railway transportation industry and minimize interruptions by governing labor disputes. *See Hawaiian Airlines v. Norris*, 512 U.S. 246, 252 (1994). The RLA was later extended to cover labor disputes in the airline industry. 45 U.S.C. § 181. To effectuate its purpose, the RLA requires arbitration of two classes of disputes, "major" disputes, which concern the formation of collective bargaining agreements or efforts to secure them, and "minor" disputes, which involve "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Hawaiian Airlines*, 512 U.S. at 253 (internal citations and quotations omitted). In this case, Defendant contends that Jackson's claims constitute minor disputes.

Minor disputes are those that "grow out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." *Id.* at 252-53 (citing 45 U.S.C. § 151a). In other words, minor disputes arise out of the duties and rights created or defined by existing collective bargaining agreements. Under the RLA, minor disputes are within the exclusive jurisdiction of arbitration panels.

---

[3] "Preemption" refers to where a statute supersedes a state law, and "preclusion" is the term used when referring to a federal law.

United contends that Plaintiff's claims are minor disputes preempted or precluded by the RLA, because they are based on portions of the CBA and LOA and are "inextricably intertwined" with an interpretation of the relevant sections of those contracts. *Def.'s Br.* at 7. On the other hand, Jackson asserts that her claims exist independent of the CBA, as they are based on a federal anti-discrimination statute, the ADEA, and its correlating state law. Jackson contends that the proper standard is whether the dispute may be "conclusively resolved" by interpreting the CBA. *See Pl.'s Br.* at 11 (citing *Hawaiian Airlines*, 512 U.S. at 255). Jackson posits that the answer to that question in this case is no, therefore Defendant's motion should be denied.

In *Hawaiian Airlines*, the Supreme Court held that the plaintiff's claims, which were based on state-law wrongful discharge causes of action, were not preempted by the RLA because they were independent of the CBA and liability turned on a "purely factual inquiry" into any retaliatory motive of the employer. 512 U.S. at 266. The Court engaged in an in-depth discussion as to what defined a minor dispute under the RLA, concluding that minor disputes are those that are "grounded in the CBA," which involve interpretation of the CBA, and that involve "duties and rights created or defined by the CBA." *Id.* at 256, 259.[4] However, the Court observed that "the RLA's mechanism for resolving minor disputes does not preempt causes of action to enforce rights that are independent of the CBA." *Id.* at 256.

This analysis has since been applied to the issue of whether the RLA precludes federal anti-discrimination statutes. Generally, courts distinguish between disputes grounded in the

---

[4] Thus, while the Court cited *Consolidated Rail Corporation (Conrail) v. Railway Labor Executives' Assn.*, 491 U.S. 299, (1989), one of its prior cases that addressed whether a particular issue was a major or minor dispute, for the proposition that a "distinguishing feature" of a minor dispute is that it can be "conclusively resolved by the existing CBA," that language did not make up an exclusive test established by the Court. *See Hawaiian Airlines*, 512 U.S. at 265 (noting that to say a minor dispute can be "conclusively resolved" by interpreting the CBA is another way of saying that the dispute does not involve rights that exist independent of the CBA).

CBA, which necessarily require interpretation of the contractual provisions, and those that do not require interpretation of the CBA but rather involve rights or obligations that exist independently of the CBA. *See Tice v. American Airlines*, Civ. No. 95-c-6890, 2001 WL 1002466, at *2 (N.D. Ill. Aug. 30, 2001) (explaining the difference as that where the lawsuit can be dispositively resolved by interpreting the CBA (precluded) and cases where the CBA is relevant, but not dispositive (not precluded)). Moreover, where the determinative question is a "purely factual" one that looks at the employee's conduct, the employer's conduct, or the employer's motive in taking the adverse action, courts will typically find that interpretation of the CBA is not required and the relevant claim is not precluded. *See Hawaiian Airlines*, 512 U.S. at 261-62 (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988)); *Ellis v. Nat'l R.R. Passenger Corp.*, Civ. No. 02-8059, 2004 WL 257392, at *4 (E.D. Pa. Feb. 11, 2004).

### (1) *Disparate Impact Claim*

Jackson's disparate impact claim, as set forth in Count 2 of her complaint, alleges that United's policies, which allow flight attendants with sick bank hours to be paid for sick days but still be assessed points, has a disparate impact on flight attendants over 40 because those flight attendants typically have longer tenure and therefore more hours accumulated in their sick banks. *See Am. Comp.* ¶ 23. In other words, when a flight attendant is assessed two points for illness, without regard to whether that individual had any accrued hours in his or her sick bank, the result is to render the accumulated hours "useless." *Id.* ¶ 24. Jackson alleges that she had over 280 hours in her sick bank at the time she was terminated. *Id*.

The disparate impact claim clearly involves duties and rights created or defined by the CBA and LOA, and it does not involve rights that exist independently from those contracts. Jackson's disparate impact claim does not involve a "purely factual dispute" or an inquiry into

the employer's motive since her claim is that United committed age discrimination simply because it had a policy in place, irrespective of how it was applied to any one employee. In other words, Jackson is, despite her assertion to the contrary, challenging the facially-neutral attendance policies as violative of the ADEA since she contends that United committed age discrimination "because it abided by the CBA [rules]." *See Malobabich v. Norfolk Southern Corp.*, Civ. No. 2:11-cv-112, 2011 WL 1791306, at *3 (W.D. Pa. May 10, 2011) (holding such a challenge involves a dispute inextricably intertwined with the CBA and one requiring interpretation of the CBA);[5] *see also Am. Compl.* ¶¶ 48, 65 (alleging United's "unreasonable" policy adversely impacts people over 40).

This type of claim, one challenging the legality of particular provisions of the CBA, is grounded in the CBA, thereby falling squarely within the meaning of a "minor dispute" as defined by the RLA and relevant case law. Thus, Jackson's disparate impact claim under the ADEA is preempted by the RLA and this court lacks jurisdiction to hear the claim. Count 2 must be dismissed.

### (2)   *Disparate Treatment Claims*

Turning now to Jackson's intentional discrimination claims, set forth in Counts 1 (ADEA) and 3 (PHRA), Plaintiff alleges that United discriminated against her on the basis of her age in how they treated her, as compared to younger flight attendants, through unfair application of the attendance policies. Specifically, Jackson enumerates four instances where she alleges United unfairly assessed points against her in contravention of its written policies. Jackson

---

[5] Plaintiff attempts to distinguish *Malobabich* by arguing that the claim involved a facial challenge to the CBA, rather than an as-applied challenge. However, Plaintiff's disparate impact claim is indeed a facial challenge to the CBA, a point Plaintiff fails to address in her arguments.

alleges that she received this disparate treatment yet "workers under the age of forty [were] not treated in this fashion."

- United applied points for two sick days in 2008, and improperly kept them as part of her point total. She claims that United's policies require such points expire after 24 months. *Am. Compl.* ¶ 41.

- United unjustifiably assessed three points for a DNF on June 18, 2009. Jackson alleges she was caught in traffic and she notified her supervisor. The flight was ultimately cancelled, therefore the traffic jam was irrelevant and should not have been the source of any assessed points. *Id.* ¶ 42.

- Jackson was unfairly assessed three points for a DNF on or about June 17, 2010. Jackson alleges she notified her supervisor that she would be absent because of jury duty for three days, yet she was not taken off the schedule for one of those days. Later, after she was excused from jury duty, Jackson attempted to report to work but was unable to make it due to a "massive," "well-documented" traffic jam, which she reported to the Crew Desk. Nevertheless, she was issued a DNF and assessed three points. *Id.* ¶ 43.

- Six unjustified points for two DNFs were assessed against her on December 28 and 29, 2010. In her amended complaint Jackson details the circumstances surrounding a "record blizzard," an "unprecedented" traffic jam, her efforts to obtain a replacement trip, and her "release from duty" after explaining that a subsequent flight would have caused her to fly under unsafe conditions. Plaintiff alleges that notwithstanding these circumstances, she was issued two DNFs for two days, despite United's policy providing that only one point value be assessed when the same incident impacts more than one day. *Id.* ¶ 44.

Jackson alleges that in late December 2010, she was notified by her supervisor, Frank Hester, that she would be suspended because of the accrual of attendance points. Jackson asserts that she had never been made aware of United's attendance policy, nor was she notified about her point accrual prior to this time. Specifically, Jackson claims that she first learned of her point accrual on January 3, 2011, when she met with Hester and he informed her that she had been sent four letters of warning regarding her attendance points, letters that Jackson alleges she never received. *Am. Compl.* ¶¶ 33-34. Defendant contends that Plaintiff received progressive

discipline for her attendance infractions, including the LOW 1 through LOW 4. *Cavanagh Dec.* ¶ 10.

On March 1, 2011, United held a "Letter of Charge Conference" regarding Jackson's point accrual. The meeting was attended by Jackson, Hester, a union representative, and two United personnel. Jackson contends that she "was not provided with a full and fair opportunity to present evidence and arguments on her behalf, as the charges and points were not fully explained and the four prior letters of charge were never received by her." *Am. Compl.* ¶ 39. As a result of the conference, Jackson was terminated, effective March 11, 2011. According to Defendant, the union appealed Jackson's termination with the United Airlines Flight Attendant System Board of Adjustment and Plaintiff's grievance is still pending. *Cavanagh Dec.* ¶ 10.

The dispositive question underlying Plaintiff's disparate treatment claims is whether United took particular action, *i.e.* applying its attendance policy to Jackson unfairly by assessing unjustified points and ultimately discharging her, because of her age. The determination as to whether United committed age discrimination will depend upon United's motive in assessing the points it did under the circumstances it did.

Plaintiff will have to show, as part of her *prima facie* case of intentional age discrimination, that she was treated differently than similarly-situated flight attendants who were younger than 40. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). While reference to the CBA and LOA may be necessary for the outline of the point-assessment system or other information relevant to Jackson's claims, an interpretation of the actual terms of the contract will not be required.[6] *See Carmona v. Southwest Airlines Co.*, 536 F.3d 344, 349

---

[6] For instance, the issue of whether United properly assessed two points against Jackson for a particular instance may necessitate consultation with the LOA to confirm that the policy instructs two points be assessed for a sick day, but the meaning of that particular provision is not in question, only whether United applied that provision properly under the circumstances.

(5th Cir. 2008) (discussing difference between provisions of the CBA being relevant to, but not dispositive of, the resolution of the plaintiff's claims and noting that, even where claims are not preempted, either party may still use the CBA to support the credibility of its claims);[7] *Watson v. Se. Pa. Transp. Auth.*, Civ. No. 96-1002, 1997 WL 560181, at *5 (E.D. Pa. Aug. 28, 1997) ("[A] claim will not be preempted if only consultation rather than interpretation of the collective bargaining agreement is required[.]").

If Plaintiff establishes a *prima facie* case of intentional age discrimination, United will then have the opportunity to set forth a legitimate, non-discriminatory reason for its conduct, which will undoubtedly be that it appropriately applied its written policies to Jackson's attendance infractions under the circumstances. Jackson will then have to point to evidence demonstrating that United's justification was pretext for age discrimination. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 (3d Cir. 1998) (outlining three steps of a pretext claim under the ADEA). This determination will involve questions of whether United was justified in assessing points under the factual circumstances, or whether it was using the attendance points system to ultimately discharge Plaintiff based on her age. In other words, the analysis will focus on how United exercised the discretion it had under the CBA and LOA to

---

[7] *Carmona* involves facts similar to Jackson's intentional discrimination claims. In that case, the plaintiff worked as a flight attendant for Southwest and his employment was subject to a CBA containing an attendance policy with point accumulation provisions similar to the instant case. *See Carmona,* 536 F.3d at 345-47. The plaintiff was eventually terminated after exceeding the maximum number of attendance points and he later sued the airline alleging, in part, that Southwest violated federal anti-discrimination statutes by assessing him attendance points in situations under which similarly-situated female flight attendants were not assessed points. *Id.* at 346. The Fifth Circuit held that the plaintiff's claims were not precluded because his claims did not require interpretation of the CBA, only reference to it. *Id.* at 351. The court opined, "[e]ven though a court would have to *refer to* the CBA to consider fully each of the alleged acts of disparate treatment, there is no disagreement about how to interpret these provisions of the CBA that detail Southwest's procedures for assessing attendance, leave, discipline, and termination." *Id.* at 349 (emphasis in original). Moreover, the court noted that the plaintiff alleged that "the CBA procedures were *applied* in a discriminatory manner, not that CBA procedures were fundamentally discriminatory." *Id.* (emphasis in original).

This distinguishing feature illustrates the difference between Jackson's claims. Her disparate impact claim, which does allege that the attendance policies are "fundamentally discriminatory," requires interpretation of the CBA and LOIA and is thus preempted. In contrast, Jackson's disparate treatment claims refer to the CBA and LOA but do not require interpretation of those contracts and they are therefore not precluded or preempted.

assess points with reasonableness and fairness. *See Am. Compl.* ¶ 26 (alleging policy provided for United to correct or adjust the point assessment if they deemed it necessary and to manage attendance issues with reasonableness and fairness); *see also Ellis*, 2004 WL 257392, at *4 (finding defendant's discretion to take a particular action "save[d] Plaintiff's claims from RLA preemption" since the issue involved factual disputes related to the employer's conduct and motives, which did not require interpretation or application of the CBA even though the relevant action was discussed in the CBA). To determine whether the points were applied fairly in this case depends not on an interpretation of any terms of the CBA or LOA, but rather on a purely factual inquiry into United's motive and Jackson's conduct.[8]

Because Jackson's intentional age discrimination claims involve rights that exist independently of the CBA and LOA, those claims are not preempted or precluded by the RLA. Thus, Defendant's motion to dismiss Counts 1 and 3 based on Rule 12(b)(1) is denied.

### B. Failure to State a Claim under 12(b)(6)

As I have dismissed Count 2, Jackson's disparate impact claim, under Rule 12(b)(1) for lack of subject matter jurisdiction, I cannot review the merits of that claim and therefore will not address United's argument that Count 2 should be dismissed for failure to state a claim under Rule 12(b)(6). Therefore, the only remaining issue raised by United is that Jackson has not sufficiently alleged an intentional discrimination claim under the PHRA because the alleged discriminatory conduct (*i.e.*, the application of the attendance policy and the decisions made to enforce it) took place in Virginia, not Pennsylvania. United argues that because Jackson did not work in Pennsylvania, and the alleged adverse employment action did not take place in Pennsylvania, Plaintiff's PHRA claim must be dismissed. *See Def.'s Br.* at 14.

---

[8] This is not to say that at a later date, after the record has been more fully developed, Jackson's intentional age discrimination claims may necessitate dismissal if it becomes clear that the claims may not be resolved without interpretation of the CBA and LOA.

Jackson contends that as a resident of Pennsylvania[9] she is protected by the PHRA, as the law applies to those who live in Pennsylvania. *See Pl.'s Br.* at 14. Jackson cites the act's "declaration of policy," which states that discrimination threatens the "inhabitants of the Commonwealth" and that the act is an exercise of the state's police power to protect the "people of the Commonwealth." *Id.* at 13-14 (citing 43 Pa. Stat. § 952(a), (c)). She contends these two statements mean that the PHRA protects its residents, regardless of place of employment or site of the adverse employment action. Plaintiff cites no case law. Rather, she points to the absence of any decision precluding a Pennsylvania resident who works out-of-state from pursuing his or her claims under the PHRA as support for her position. *Id.* at 14.

To begin with, I must look to the actual statutory language. The relevant section of the PHRA states that it shall be unlawful for "any employer" to discriminate against an "individual" or independent contractor. 43 Pa. Stat. § 955(a). The term "individual" is not defined by the statute, and "employer" is defined as "any person employing four or more persons within the Commonwealth . . .." *Id.* § 954(b). Moreover, the statute allows "any person" claiming to be a victim of discrimination to file a complaint with the Pennsylvania Human Rights Commission. *Id.* § 959(a). The term "person" includes "one or more individuals." *Id.* § 954(a).

Thus, the statutory language does not expressly limit the statute to cover only individuals who work within Pennsylvania or those who live and work in Pennsylvania or those who allege discriminatory acts that took place within the state's borders. The definition of employer also does not foreclose an individual, living in Pennsylvania but working in another state, from bringing a claim under the PHRA. That definition requires only that the employer "employ[]

---

[9] Jackson alleges that she is a resident of Pennsylvania and was so during the relevant time period. *Am. Compl.* ¶ 3. She previously worked for United in Pennsylvania, but her job transferred to the D.C. area in 2006 and the discriminatory acts Jackson complains of are not alleged to have occurred in Pennsylvania.

13

four or more persons" in Pennsylvania. There is no contention here that United employs less than four individuals within the state so that Pennsylvania laws would not govern its conduct or Pennsylvania courts would not have jurisdiction over it as a defendant. The statutory language, including the act's stated "findings and declaration of policy," in combination with a fair reading of the statute, mean that Jackson's claim should proceed. *See id.* § 952.

The few cases addressing the reach of the PHRA are not contrary to this conclusion. Both cases cited by United involve plaintiffs who neither resided nor worked in Pennsylvania.[10] *See Blackman v. Lincoln Nat. Corp.*, Civ. No. 10-6946, 2012 WL 6151732 (E.D. Pa. Dec. 10, 2012) (Illinois resident who worked in the defendant's Illinois office brought PHRA claim because Pennsylvania was the location of the defendant's principal place of business and headquarters); *Taylor v. Rodale, Inc.*, Civ. No. 04-799, 2004 WL 1196145 (E.D. Pa. May 27, 2004) (Georgia resident who worked in Georgia brought claims under PHRA because decision-makers who engaged in discriminatory practices worked in Pennsylvania). Those cases both held that the PHRA did not protect nonresidents not working in Pennsylvania.

However, a reading of both cases suggests that the residence of the plaintiff was a critical fact, and had the plaintiff lived in Pennsylvania, the outcome might have been different. *See, e.g.*, *Blackman*, 2012 WL 6151732, at *6 (noting that its determination that the PHRA "does not protect individuals that **neither reside nor work** in Pennsylvania" consistent with the majority of other courts considering the jurisdictional reach of a state anti-discrimination statute and citing a string of cases all dismissing claims brought by a plaintiff who neither lived nor worked in that

---

[10] *Denty v. Smithkline Beecham Corp.*, 109 F.3d 147 (3d Cir. 1997), addressed the circumstances under which the ADEA would apply outside the United States. Therefore, its reasoning is not helpful in this case. In addressing the PHRA specifically, the *Denty* opinion stated only that the plaintiff's PHRA claim "must likewise be dismissed as no evidence exists to show the Pennsylvania legislature intended to apply the PHRA to employment decisions made by **foreign** corporations for positions **located outside the United States**." *Id.* at 151 n. 7 (emphasis added).

14

state); *Taylor*, 2004 WL 1196145, at *3-4 (discussing PHRA's declaration of policy and noting that the language "suggests that it contemplated only the protection of **residents** and workers in Pennsylvania").[11] Indeed, Judge Surrick in the *Blackman* case contemplated a scenario where the PHRA protected *only* those who resided in Pennsylvania, leaving open the issue of whether the act protected "a broader class of individuals, such as those who work but do not reside in Pennsylvania." *See Blackman*, 2012 WL 6151732, at *3, *3 n.6.

I read the PHRA to protect residents of Pennsylvania and as Jackson has alleged that she lived in the state during the relevant times, I find that Plaintiff has stated a claim under 43 Pa. Stat. § 955(a).

In sum, the defendant's 12(b)(6) motion to dismiss Count 2 of Plaintiff's complaint is denied as moot, and the motion to dismiss Count 3 is denied for the reasons set forth above.[12]

### C. Failure to Join the Union as a Necessary Party

A person deemed necessary to the action under Rule 19 must be joined as a party if joinder is feasible. *See* Fed. R. Civ. P. 19(a) (listing factors to consider regarding necessity of the party and requiring joinder as long as the person is subject to service of process and joinder will not deprive the court of subject matter jurisdiction). If joinder of a required party is not feasible, then "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* 19(b) (listing four factors

---

[11] United cites the *Taylor* court's reference to the "relevant location" under the PHRA as the location of the plaintiff's workplace. *Def.'s Br.* at 14. However, the dispositive issue in *Taylor* was whether the discriminatory conduct took place in Pennsylvania where the decision-maker was located or if it was in Illinois where the plaintiff actually worked. *Taylor*, 2004 WL 1196145, at *2-3. The court held that, with respect to determining the location of the discriminatory act, it was the location of the plaintiff's workplace, not the supervisor's location. *Id.* at *3. This finding does not contemplate a scenario where the plaintiff is a resident of Pennsylvania and it therefore does not influence the outcome of my decision.

[12] United does not argue that Count 1, intentional discrimination under the ADEA, should be dismissed for failure to state a claim under Rule 12(b)(6).

for the court to consider to determine if the party is indispensable to a just resolution). Therefore, as an initial matter, I must determine whether the union is "necessary" to the action. *See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir. 1993).

United contends that the union is a necessary party because joinder of the union is essential to effectuate complete relief. United argues that the relief sought by Jackson would, in part, require United to take action with respect to its policies contained in the CBA and LOA, contracts that were negotiated by the union, thereby impairing the interests of the union.

The disparate impact claim was the only cause of action in Jackson's complaint implicating the possible necessity of joining the union as a party-defendant in this case. That claim raised issues surrounding the legality of certain provisions of the CBA and LOA, as well as the potential, depending on the outcome of the litigation, for changes to those contracts or United's obligations under them in relation to the union or other employees represented by the union. As Count 2 has been dismissed, these concerns and the union's potential interests are no longer relevant.

The only remaining claims are for intentional age discrimination, *i.e.*, whether United unlawfully applied the otherwise lawful attendance and sick leave policies to Plaintiff and perhaps other flight attendants older than 40. There is no allegation that the union was involved in the discriminatory acts. Moreover, the relief Jackson seeks with respect to her remaining claims will not require changes be made to the actual CBA and LOA, as her existing complaint challenges only how those contractual provisions were applied in a unlawful manner based on United's discriminatory motive. For the reasons discussed at length above, no interpretation of the contracts is necessary for resolution of Jackson's intentional discrimination claims.

Because complete relief can be accorded to the parties without joinder of the union, and disposing of the action in the absence of the union will not impair or impede the union's ability to protect its interests related to the subject matter of the litigation, nor will it leave United subject to a substantial risk of double, multiple or otherwise inconsistent obligations, the union is not a necessary party to the action under Rule 19(a).  *See* Fed. R. Civ. P. 19(a)(1)(A)-(B).  Since "a holding that joinder is compulsory under Rule 19(a) is a necessary predicate to a district court's discretionary determination under Rule 19(b)," there is no need to discuss any of the factors set forth in Rule 19(b) or United's arguments in favor of dismissal because the action cannot proceed without the union.  *See Janney*, 11 F.3d at 405; *Def.'s Br.* at 9-12.  Defendant's motion to dismiss Jackson's complaint pursuant to Rule 12(b)(7) is denied.

## IV.   CONCLUSION

For the aforementioned reasons, Count 2 of Jackson's amended complaint, her claim of disparate impact under the ADEA, is dismissed for lack of subject matter jurisdiction.  Plaintiff's claims for intentional age discrimination, set forth in Counts 1 and 3, are not preempted or precluded under the RLA and I have jurisdiction over those claims.  Jackson has sufficiently stated a claim under the PHRA, therefore Defendant's motion to dismiss Count 3 under Rule 12(b)(6) is denied.  Finally, the Association of Flight Attendants, CWA, is not a necessary party to the action and United's motion to dismiss for failure to join the union is denied.

An appropriate order follows.